**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**CIVIL CASE NO. 1:25-cv-00246-MR-WCM**

| | | |
|---|---|---|
| **EAST FORK POTTERY, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **<u>MEMORANDUM OF DECISION AND ORDER</u>** |
| | ) | |
| **THE PHOENIX INSURANCE COMPANY** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**THIS MATTER** is before the Court on the Defendant's Motion for Summary Judgment [Doc. 16] and the Plaintiff's Motion for Partial Summary Judgment [Doc. 19].

## I. PROCEDURAL BACKGROUND

On August 5, 2025, Plaintiff East Fork Pottery, LLC filed the present action against the Defendant The Phoenix Insurance Company, asserting claims for breach of contract and unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.* ("UDTPA"). [Doc. 1]. On June 16, 2026, the parties filed dispositive motions. The Defendant has moved for summary judgment on both claims brought against it. [Doc. 16]. The

Plaintiff has moved for partial summary judgment on the UDTPA claim. [Doc. 19]. Having been fully briefed, this matter is now ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As the Supreme Court has observed, 'this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'" Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).

"Facts are material when they might affect the outcome of the case, and a genuine issue exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." Ballengee v. CBS Broad., Inc., 968 F.3d 344, 349 (4th Cir. 2020) (citation omitted). When ruling on a motion for summary judgment, the Court does not "weigh the evidence or make credibility determinations." Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016) (citation omitted). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking

summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat, 346 F.3d at 522. If this showing is made, the burden then shifts to the nonmoving party who must convince the Court that a triable issue does exist. Id.

When, as here, the parties each move for summary judgment, the Court "must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citation omitted). In considering each of the motions for summary judgment, the Court must view the pleadings and materials presented in the "light most favorable" to the nonmovant and must "draw all reasonable inferences" in the nonmovant's favor. Adams v. UNC Wilmington, 640 F.3d 550, 556 (4th Cir. 2011). However, courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." E. Shore Mkt. Inc. v. J.D. Assocs., LLP, 213 F.3d 175, 180 (4th Cir. 2000).

## III. FACTUAL BACKGROUND

The following facts are undisputed. The Plaintiff operates a pottery business with multiple manufacturing, retail, and administrative properties in Asheville, North Carolina, including one on Short McDowell Street ("Short

McDowell") and another on Caribou Road ("Caribou").[1] [Doc. 17: Morrison Decl. at ¶ 16]. The Plaintiff purchased an insurance policy (the "Policy"), containing a Deluxe Property Coverage Form ("Primary Form") and a Deluxe Business Income Coverage Form ("BI Form"), from the Defendant. [Id. at ¶ 6]. The Policy insures the Plaintiff's business properties for the period of June 28, 2024 to June 28, 2025. [Id.].

In relevant part, the BI Form grants coverage for losses "caused by" or which "result from" a "direct physical loss of or damage to property" at the covered premises, unless the loss is excluded or otherwise limited by the Policy. [Doc. 17-1: Policy at 61]. Under the "Civil Authority" provision, the BI Form provides coverage for lost business income and expenses incurred "by action of civil authority that prohibits access to the [covered] premises," provided that certain criteria are met. [Id. at 62-63]. The BI Form further provides that coverage may be extended for business income lost or expenses incurred when ingress to or egress from the covered premises is prevented by a direct physical loss or damage by a Covered Cause of Loss

[1] The Plaintiff also operates its business at two other locations, known as the Fairview and Walnut properties. The Plaintiff did not, however, explicitly mention either of these two properties in its complaint or in its briefings. The coverage letters at issue here denying business income insurance coverage also do not concern these two properties. Accordingly, the Plaintiff's Fairview and Walnut properties are not at issue.

to property away from, but within one mile of, the covered premises. [Id. at 66].[2]

The Primary Form contains certain exclusions to coverage, which provide, in pertinent part, as follows:

> **C. EXCLUSIONS**
>
> **1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage. Exclusions C.1.a. through C.1.1. apply whether or not the loss event results in widespread damage or affects a substantial area.
>
> . . . .
>
> **i. Utility Services**
>
> The failure or fluctuation of power, communication, water or other utility service supplied to the described premises, however caused, if the failure or fluctuation:
>
> **(1)** Originates away from the described premises; or
>
> **(2)** Originates at the described premises, but only if such failure or fluctuation involves equipment used to supply the utility service to the described premises from a

[2] Capitalized words and words in quotation marks are specifically defined in the Policy itself. [See, e.g., Doc. 17-1: Policy at 1 (stating that "phrases that appear in quotation marks have special meaning")]. As such, any words that are not capitalized or in quotation marks carry their ordinary meaning.

source away from the described premises.

Failure or fluctuation of any utility service includes lack of sufficient capacity and reduction in supply.

But if the failure or fluctuation of power, communication, water or other utility service results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

[Id. at 40, 42]. Although the Primary Form also lists "flood" as an exclusion, [id. at 43], the Policy contains a Broad Form Flood Endorsement (the "Flood Endorsement"), which provides that "'Flood' is added to the Covered Causes of Loss" under the Primary Form, [id. at 88]. The Flood Endorsement further extends flood coverage as follows:

**A. APPLICATION OF THIS ENDORSEMENT**

. . . .

**3.** This endorsement also applies to:

. . . .

**c.** The Civil Authority Additional Coverage in the Business Income (And Extra Expense), Business Income (Without Extra Expense) and Extra Expense Coverage Forms, regardless of the Flood Zone or community in which the "flood" loss that triggers the coverage occurs . . . ; and

**d.** Utility Services – Direct Damage or Utility Services – Time Element coverage provided under this Coverage Part, if any, regardless of

> the Flood Zone or community in which the "flood" loss to the utility services property that triggers the coverage occurs . . . .
>
> **4.** Except as provided in **A.3.a.** through **A.3.d.** above, this endorsement does not apply to loss or damage caused by or resulting from "flood" that occurs away from the premises described in **A.1.** and **A.2.** above.

[Id. at 88-89]. At the time relevant to this action, the Policy did not contain the "Utility Services – Direct Damage or Utility Services – Time Element" endorsement required to extend flood coverage to utility services under the Flood Endorsement Section A.3.d. [Doc. 16-6 at 2-3: Requests for Admission Nos. 1-4].[3]

On September 26 and September 27, 2024, Hurricane Helene devastated the Asheville area. Hurricane Helene downed trees and power lines that rendered many roads impassable, [Doc. 16-7; Press Release], and authorities instituted travel restrictions and curfews that limited access to the Plaintiff's properties, [compare Doc. 16-10 at 2: Interrogatory No. 2 (stating Short McDowell's normal 6:30 a.m. to 10 p.m. hours of operation), with Doc. 16-18: Press Release at 1 ("A curfew will be in effect within the city limits of Asheville from 7:30 p.m. to 7:30 a.m. beginning tonight, Friday, September

[3] The Plaintiff later added the "Utility Services – Direct Damage or Utility Services – Time Element" endorsement to its Policy, but only after the loss-causing event in this case. [Doc. 17: Morrison Decl. at ¶¶ 9, 10].

27."). Additionally, Hurricane Helene caused damage at locations distant from Plaintiff's premises that resulted in the extended interruption of Plaintiff's electrical and water utilities, both of which are essential to its operations. [Doc. 16-1 at 23-26: Matisse Dep. at 25:24-26:13, 27:14-28:88; Doc. 16-2 at 11-12: Segal Dep. at 10:4-11:23]. "Water and electricity utility services were interrupted, fully or partially, from approximately September 26, 2024 to October 20, 2024." [Doc. 16-10 at 8: Interrogatory No. 7].

Consequently, the Plaintiff's properties were closed until October 13 at Caribou and October 14 at Short McDowell, resulting in business income losses. [Id. at 3: Interrogatory No. 3; see Doc. 16-1 at 43: Matisse Dep. at 58:1-4 (Q: ". . . business operations were interrupted, is one of those myriad reasons off-premises damage to utilities caused by flood water.?" A: "One of them.")]. The Plaintiff reopened its properties after electric utility services were restored; as water utilities were not restored until some time later, the Plaintiff rented water tanks for its operations. [Doc. 16-1 at 23-26: Matisse Dep. at 25:24-26:2, 27:14-29:9; Doc. 16-2 at 29-30: Segal Dep. at 38:7-39:4].

On October 2, 2024, the Plaintiff filed claims for business interruption losses for the period of September 27, 2024 to October 14, 2024. [Doc. 16-3 at 55: Hassler Dep. at 76:11-21]. On December 27, 2024, the Defendant denied BI Form coverage for Short McDowell and Caribou, which is the

subject of this action.[4] [Docs. 20-5, 20-6]. In its BI Form denial letters, the Defendant[5] stated as follows:

> We inspected the damages with you on 10/23/2024. Our research found that there was no direct physical loss to the property that would cause operations to cease. It was determined that flood water entered part of the conference room, [lactation] room and part of the break room. You advised that operation of the business stopped due to the off premises damage to the utilities caused by flood water.

[Doc. 20-5 at 2, Doc. 20-6 at 2]. In these letters, the Defendant cited only to the BI Form's general granting provisions—BI Form Part A, which grants coverage for "actual loss of Business Income," and BI Form Section A.3, which defines "Covered Causes of Loss." [Doc. 20-5 at 3; Doc. 20-6 at 3]. The Defendant also cited to the Flood Endorsement Section A.3, which extends flood coverage to loss arising out of the Civil Authority provision and out of the Utility Services – Direct Damage or Utility Services – Time Element provision, if any. [Doc. 20-5 at 3-4; Doc. 20-6 at 3-4]. The Defendant did not, however, cite the BI Form's Civil Authority granting provision or the Ingress or Egress coverage extension. The Defendant also did not cite any exclusionary provisions from either the BI Form or the Primary Form. As

---

[4] The Defendant also denied Primary Form coverage for property damage to three of the Plaintiff's properties. [Docs. 20-2, 20-3, 20-4]. These denials are not in dispute.

[5] The Defendant acted through its claim administrator, The Travelers Indemnity Company, and its adjuster, Antonio Morris. [Doc. 17: Morrison Decl. at ¶¶ 2-4].

explanation for its coverage decision, the Defendant stated, "Because your loss of business income was caused by flood damages to the off premises utilities, your policy does not provide coverage for this loss." [Doc. 20-5 at 4; Doc. 20-6 at 4].

Concurrently, the parties[6] exchanged various emails from October to December of 2024, in which the Plaintiff continuously requested an explanation of potential BI Form coverage. The Plaintiff stated that "[f]lood caused the Utilities Interruption (loss of water) at both locations regardless of electrical outage being attributed to off premises overhead power lines limitations," [Doc. 16-12 at 1], and the Plaintiff did not "see" in the BI Form an "exclusion for off premises utility failure," which "is in the Deluxe Property form addressing Building . . . but does not address BI. This is all very confusing to the insured (+ me [the insurance broker] with 40 years of commercial experience)," [Doc. 20-9 at 6]. The Defendant maintained, without further explanation or citation to specific policy provisions, that "[t]he policy does not cover for loss of business due to power outage that originated off the location." [Doc. 16-12 at 1]. From April to June of 2025, the Plaintiff, through its recovery counsel, repeatedly asked for reconsideration of the BI

[6] The Plaintiff acted through its insurance broker, Sam Stickney. [Doc. 16-1 at 43-44: Matisse Dep. at 58:18-59:23].

Form denials, but the Defendant never responded. [Doc. 1-2; Doc. 20-10 at 2].

On October 5, 2025, the Plaintiff initiated this action. [Doc. 1]. The Defendant now asks the Court to determine as a matter of law whether the Plaintiff's business income loss, which was caused at least in part by utility disruption, is covered under the Policy. [Doc. 16]. The parties also ask the Court to determine as a matter of law whether the Defendant's actions while adjusting the Plaintiff's coverage constitute unfair and deceptive trade practices. [Docs. 16, 19].

## IV. DISCUSSION

### A. Breach of Contract

District courts sitting in diversity must apply the forum state's choice-of-law rules. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). Here, North Carolina's choice-of-law rules dictate that North Carolina law applies because the Policy was delivered in North Carolina to the Plaintiff. Fortune Ins. Co. v. Owens, 351 N.C. 424, 428, 526 S.E.2d 463, 466 (2000) ("With insurance contracts the principle of *lex loci contractus* mandates that the substantive law of the state where the last act to make a binding contract occurred, usually delivery of the policy, controls the interpretation of the contract.").

Under North Carolina law, a breach of contract claim requires (1) the existence of a valid contract and (2) failure to perform in accord with the terms of that contract. Poor v. Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). Here, the Policy is undisputedly a valid contract. Rather, the parties contest whether the Policy covered the Plaintiff's business income losses such that the Defendant breached the Policy in denying coverage.

"In North Carolina, determining the meaning of language in an insurance policy presents a question of law for the Court." Accardi v. Hartford Underwriters Ins. Co., 373 N.C. 292, 295, 838 S.E.2d 454, 456 (2020) (citing Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co., 276 N.C. 348, 354, 172 S.E.2d 518, 522 (1970)). "As in other contracts, the objective of construction of terms in an insurance policy is to arrive at the insurance coverage intended by the parties when the policy was issued." Id. (quoting Wachovia, 276 N.C. at 354, 172 S.E.2d at 522). To that end, the "various terms of the policy are to be harmoniously construed, and if possible, every word and every provision is to be given effect." C.D. Spangler Const. Co. v. Indus. Crankshaft & Eng'g Co., 326 N.C. 133, 142, 388 S.E.2d 557, 563 (1990) (quoting Woods v. Nationwide Mut. Ins. Co., 295 N.C. 500, 505–06, 246 S.E.2d 773, 777 (1978)). "Where a policy defines a term, that definition

is to be used." Id. Ambiguities in insurance policies must be resolved in favor of the insured. Id.

Because there are no material facts in dispute, interpretation of the Policy is appropriate as a matter of law. See N. State Deli, LLC v. Cincinnati Ins. Co., 386 N.C. 733, 740, 908 S.E.2d 802, 808 (2024); Ballard v. State Farm Fire & Cas. Co., 714 F. Supp. 3d 630, 638 (E.D.N.C. 2024).

Here, the Plaintiff asserts claims for lost business income incurred during the period of September 27, 2024 through October 14, 2024, when off-premises flooding interrupted electrical service to the Plaintiff's facilities. The parties dispute whether these circumstances fall within the coverage provisions of the Policy. The thrust of the Defendant's Motion for Summary Judgment, however, is that even if coverage did exist, the circumstances presented fall within an exclusion to coverage, and the Defendant properly denied the claim on that basis. Accordingly, the Court will proceed to address the salient questions of whether any of the Policy's exclusions apply.

The Policy includes an "anti-concurrent causation clause," which "excludes coverage for certain losses, regardless of whether the loss arises from more than one cause or sequence of events." Builders Mut. Ins. Co. v. Glascarr Props., Inc., 202 N.C. App. 323, 326, 688 S.E.2d 508, 511 (2010).

Therefore, if any single cause of the Plaintiff's business interruption falls within an exclusion, the claim is properly denied.

In relevant part, the Policy specifically excludes from coverage any loss caused by "failure . . . of power . . . or other utility service supplied to the described premises, however caused" if it "[o]riginates away from the . . . premises." [Doc. 17-1: Policy at 41]. Here, it is undisputed that the Plaintiff's business income losses were caused, at least in part, by the flooding at a location away from the insured property which caused the interruption of power to the Plaintiff's businesses. As such, the exclusion precludes coverage for the Plaintiff's loss.

However, the Policy contains an exception to this exclusion. Namely, if a distant power failure "results in a Covered Cause of Loss," then the damage from that Cause of Loss is covered. [Id.]. For instance, if a power outage causes a fire on the insured's property, then the fire loss would be covered.

On this point, the Plaintiff argues that North State Deli, LLC v. Cincinnati Insurance Co., 386 N.C. 733, 740, 908 S.E.2d 802, 808 (2024), dictates a different interpretation. In that case, the plaintiffs were a collection of bars and restaurants that were forced to suspend business operations because of COVID-19-related orders by government authorities. Id. at 734,

908 S.E.2d at 805. Each of the plaintiffs had an insurance policy which protected the businesses' property and business income from any "direct physical loss" to property that was not excluded by the policy. Id. at 734-35, 908 S.E.2d at 805. The Supreme Court held that the forced temporary restrictions on the use of and access to the plaintiffs' physical properties were a covered "direct physical loss" to the plaintiffs. Id. at 735, 908 S.E.2d at 805.

Relying on North State Deli, the Plaintiff argues that the "loss of use of or access to [the Plaintiff's] Covered Property" constitutes a "direct physical loss," which in turn is a "Covered Cause of Loss," and thus is covered under the exception. [Doc. 23 at 18]. The Plaintiff's argument fails, however, for three reasons.

First, unlike the plaintiff in North State Deli, the Plaintiff here did not lose the ability to physically use or physically operate the property. The Plaintiff could still freely enter and operate everything associated with its business, but for the remote interruption of electric power. Use of a generator or alternate power source would have allowed full use of the property.

Second, the Plaintiff's interpretation of the exception defines it to be identical in scope and breadth to the exclusion. Thus, taking the two provisions together as argued by the Plaintiff makes them a nullity. It is a

"central principle of contract interpretation that the various terms of a contract are to be harmoniously construed, and if possible, every word and every provision is to be given effect." Advisor Law, LLC v. Holland, 302 N.C. App. 552, 557, 927 S.E.2d 39, 43 (2026). The Plaintiff's argument runs afoul of that premise.

Third, the Plaintiff's interpretation ignores some of the terms of the exception, thus re-writing the provision to mean something that it does not. The Policy states that "Covered Causes of Loss means Risks of Direct Physical Loss." [Doc. 17-1: Policy at 40]. The exception applies where a remote power failure "results in a Covered Cause of Loss." Thus, two levels of causation are required for the exception to apply. The power failure must cause *something* that is itself a cause of physical loss. The Plaintiff cites North State Deli to re-write this exception to mean that coverage is available if the remote power failure "results in a Covered Loss," omitting the operative word "Cause." North State Deli, however, provides no support for this view.

For these reasons, the Court concludes that the exclusion pertaining to the remote power failure excludes the Plaintiff's loss from coverage, and the cited exception does not save it. The Defendant was correct in its interpretation and application of the Policy language to the Plaintiff's claim.


Case 1:25-cv-00246-MR-WCM Document 31 Filed 11/10/26 Page 16 of 22

Therefore, the Defendant is entitled to summary judgment on the Plaintiff's breach of contract claim.

**B. Unfair and Deceptive Trade Practices**

Notwithstanding the failure of its breach of contract claim, the Plaintiff asserts that its claim for unfair and deceptive trade practices survives. The Plaintiff is correct that this claim is not dependent on the viability of its contract claim. See Nelson v. Hartford Underwriters Ins. Co., 177 N.C. App. 595, 609, 630 S.E.2d 221, 231 (2006) ("[E]ven if an insurance company rightly denies an insured's claim, and therefore does not breach its contract, as here, the insurance company nevertheless must employ good business practices which are neither unfair nor deceptive."). Under North Carolina law, a violation of any subsection of N.C. Gen. Stat. § 58-63-15(11) constitutes a violation of the UDTPA as a matter of law. G. Tyson Hopkins Assoc LLC v. Com. & Indus. Ins. Co., 822 F. Supp. 3d 614, 626 (E.D.N.C. 2026).

Here, the Plaintiff argues that only one provision of § 58-63-15(11) was violated by the Defendant, that being subsection (n).[7] Whether an insurer's

[7] While the Plaintiff contends that other subsections were also violated, the Plaintiff has not pointed the Court to any forecast of evidence with respect to any other provision. Judges "are not like pigs, hunting for truffles buried in briefs." Hensley ex rel. N.C. v. Price, 876 F.3d 573, 581 n.5 (4th Cir. 2017) (citation omitted). Similarly, the Court is not obligated to scour the record for evidence of unfair or deceptive acts that have not been argued or briefed.

conduct violated § 58-63-15(11)(n) is a question of law for the Court, since there are no disputes to the facts of the Defendant's conduct on this issue. See Gray v. N.C. Ins. Underwriting Ass'n, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000). Therefore, this issue can be disposed of, one way or the other, as a matter of law.

The Plaintiff asserts that the Defendant violated N.C. Gen. Stat. § 58-63-15(11)(n) because the Defendant's denial letters cited irrelevant material, omitted essential Policy provisions, failed to explain how the Policy provisions applied, failed to evaluate wind and Civil Authority coverage after explicitly agreeing to do so, and failed to reconsider the denials in accordance with North State Deli. [Doc. 20 at 18-22]. Under N.C. Gen. Stat. § 58-63-15(11)(n), an insurer must "promptly initiate[] an investigation and then provide[ ] a detailed explanation of its results, preferably with supporting documentation." DENC, LLC v. Phila. Indem. Ins. Co., 426 F. Supp. 3d 151, 155 (M.D.N.C. 2019), aff'd, 32 F.4th 38 (4th Cir. 2022). It is insufficient to merely "list all potentially applicable policy terms alongside the facts"; the insurer must "bridge the gap between policy and fact." DENC, LLC v. Phila. Indem. Ins. Co., 32 F.4th 38, 50-51 (4th Cir. 2022) ("[The insurer] had the duty to reasonably spell out that connection in the first instance.").

On this issue, the Fourth Circuit's decision in DENC is instructive. In that case, the court held that an insurer violated the UDTPA when it (1) initially granted coverage and then weeks later denied coverage in a "confusing letter" that (2) included provisions that "were not even part of the policy" but that had been "deleted and superseded" or "patently [did not] apply," and (3) failed to "explain which of the many enumerated provisions barred coverage" while also omitting the single exclusionary provision upon which its conclusion relied. Id. (alteration in original). Importantly, the Fourth Circuit held that there need not be actual deception, only that, given the context, the "denial letter had the 'capacity to mislead'" the insured into "believ[ing] that the inapplicable policy provisions in the denial letter barred coverage." Id. at 52. In a subsequent case, the North Carolina Court of Appeals relied on DENC in holding that the insurer violated the UDTPA when it denied a claim "based on a different exclusion than what was described in the denial letter" such that even the adjuster who drafted the letter "could not provide a concrete explanation of why coverage was denied." Restorepro Reconstruction, Inc. v. Simpson, 928 S.E.2d 532, 2026 WL 1020608, at *14-17 (N.C. Ct. App. 2026) (unpublished table decision).

Here, unlike the insurers' communications in DENC and Restorepro, the Defendant's coverage letters and other communications—while not the

model of clarity—consistently denied coverage based on utilities disruption. Unlike in DENC, the denial letters did not include provisions not part of the policy or that had been deleted or superseded. The BI Form denials also did not include provisions that patently did not apply. Specifically, the denials cited the BI Form's provision for coverage of "actual loss of Business Income" and "Covered Causes of Loss," both directly on point. They also cited the Flood Endorsement, which was an important consideration for coverage under the Civil Authority provision. Despite including some of the Flood Endorsement's irrelevant extensions, the denials do not rise to the egregious level of that with fabricated provisions in DENC. Similarly, although the Primary Form coverage letters included irrelevant language regarding the insured's right to mediate any residential claim, despite these claims arising under a commercial policy, [Doc. 20 at 5-6], the notification was so clearly inapplicable to the Plaintiff that it did not have the capacity to mislead, and in any event, did not impact the BI Form letters at issue in this case.

Although the Defendant could have more clearly explained its decision, the Defendant consistently maintained its denial as based on utilities disruption and did not so egregiously bombard the Plaintiff with patently inapplicable or fabricated provisions such that the letters had the requisite

capacity to mislead. Accordingly, the Defendant is entitled to summary judgment on the Plaintiff's claim under N.C. Gen. Stat. § 58-63-15(11)(n).

## V. CONCLUSION

In sum, the Court concludes that the Policy's anti-concurrent causation provision precludes coverage because the Plaintiff's business income losses were caused, at least in part, by the failure or fluctuation of utilities, which was expressly excluded under the Policy. Additionally, the undisputed forecast of evidence demonstrates that the Defendant did not commit unfair and deceptive trade practices during the adjustment of the Plaintiff's claim. Accordingly, the Court grants summary judgment in the Defendant's favor on both of the Plaintiff's claims, which will be dismissed with prejudice.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 16] is hereby **GRANTED**, and the Plaintiff's Motion for Partial Summary Judgment [Doc. 19] is hereby **DENIED**.

**IT IS FURTHER ORDERED** that the Plaintiff's claims against the Defendant are hereby **DISMISSED WITH PREJUDICE**.

A Judgment consistent with the Memorandum of Decision and Order shall be entered contemporaneously herewith.

The Clerk is respectfully requested to close this civil case.

**IT IS SO ORDERED.**

Signed: November 9, 2026

Martin Reidinger
Chief United States District Judge